JOHN VACCARO, PETITIONER-DEFENDANT, v. WALTER KIDDE & COMPANY, RESPONDENT-PROSECUTOR.

Submitted October 2, 1945—Decided July 25, 1946.

Before Justices DONGES, HEHER and COLIE.

For the prosecutor, *John W. Taylor.*

For the defendant, *Louis C. Jacobson.*

The opinion of the court was delivered by

HEHER, J. The issue here is whether the defendant Vaccaro is totally and permanently disabled in consequence of an industrial accident attributable to his employment with prosecutor, and therefore entitled to the compensation for such provided by *R. S.* 34:15–12(b). The Compensation Bureau and the Essex Common Pleas both resolved the inquiry in the affirmative, and compensation was awarded at the statutory rate for 400 weeks; and the employer now challenges the judgment by *certiorari*.

On July 21st, 1942, the employee's left eye was lacerated by a broken wire while he was in the pursuit of his employment, and the injury was such as to require the enucleation of the eyeball on the ensuing September 1st. The wire did not come into contact with the right eye, and concededly there was no direct injury to that member by external force. But

the Deputy Commissioner found that, while there was testimony indicating a 36% astigmatic loss of vision in the employee's right eye prior to the accident, the proofs established to his satisfaction that, as a result of the mishap, the employee suffered hysterical amblyopia of that eye, and consequent industrial blindness, which "would have resulted even if" there had been "no pre-existing loss of vision in that member," and that, moreover, an ensuing neurosis had also permanently disabled him to the extent of 20% of total, and this would more than offset an allowance for the prior loss of vision of the right eye, and the employer is not entitled "to a credit for any pre-existing condition which did not contribute to the end result" of industrial blindness, and therefore the "One Per Cent Fund" Act (N. J. S. A. 34:15–94,. et seq.) has no application. Judge Naughright in the Pleas determined that the accident resulted in "a neurosis and a condition of hysterical amblyopia in" the employee's right eye "which produced industrial blindness in that eye."

It is the insistence of the employer that the "defective vision" of the employee's right eye "is wholly unrelated to the accident;" that the employee "has no neurosis or hysterical condition;" and that he "is entitled only to compensation for the loss of his left eye." It is also urged that, on the contrary hypothesis, the employer is liable only for the reduction in the visual acuity of the right eye directly imputable to the accident, i. e., the difference between the pre-existing loss of 36% and the subsequent total loss of 80% of normal vision found by one of the employer's ophthalmologists, and the award for permanent disability, citing the principles expounded in the cases of Richardson v. Essex National Trunk and Bag Co., Inc., 119 N. J. L. 47, and Colarusso v. Bahto, 128 Id. 537, should not exceed 35% of total, or 175 weeks.

There can be no doubt that the visual acuity of the employee's right eye was materially below standard prior to the accident. But we are clear that, if a substantially useful member of the physiologic unit of sight is rendered useless by an industrial accident which also results in the enucleation of the other member, there is total and permanent disability within the intendment of R. S. 34:15–12 (v), and compensable

as such, even though the visual acuity of the one was much less than that of the other before the mishap. Prior organic or functional perfection or visual normality is not a condition prerequisite to liability for the statutory compensation for the total and permanent loss of the faculty of sight. The ruling principle is to be found in the case of *Combination Rubber Manufacturing Co.* v. *Obser*, 95 *N. J. L.* 43; *affirmed, sub nom. Combination Manufacturing Co.* v. *Court of Common Pleas*, 96 *Id.* 544. In such circumstances, *R. S.* 34:15–95, as amended by *chapter* 133 *of the Laws of* 1940 (*Pamph. L., p.* 28), has no application. There is then a loss of "both eyes" as a result of "one accident" within the purview of *R. S.* 34:15–12(v), *supra;* and such is total disability caused by the compensable accident "in itself and irrespective of any previous condition or disability" within the meaning of the proviso contained in *R. S.* 34:15–95, as amended.

Here, it seems to be conceded that the employee's right eye is "industrially blind," and he is therefore totally and permanently incapacitated as that term is known in the Compensation Act; and thus the decisive question is whether on the evidence the blindness is fairly ascribable to the mishap. We think it is. The proofs bring this hypothesis reasonably within the realm of probability.

The pre-existing visual subnormality was due to congenital hyperopic astigmatism (farsightedness) of both eyes. The employer adduced ophthalmologic opinion that there was also an attendant condition of the right eye known as amblyopia ex anopsia, a scientific term denoting a deficiency of visual power (imperfect sensation of the retina) attributable to early and continuous nonuse or prolonged disuse of the eye, without organic disease—sometimes termed a "lazy eye." There was a convergent squint of the right eye which may be a factor contributing to amblyopia, an expression signifying dimness of vision without pathology or evident change in the ocular structure. And there was evidence that severe astigmatism tends in the same direction. Errors of refraction are ordinarily correctible by a lens, depending upon the degree of the refractive error and the nature of the lesions and eye changes; amblyopia is usually remediable to some degree

by eye exercise and continued use, sometimes with the aid of a lens, although the corrective influence of a lens is the subject of some controversy. It is the insistence of the employee that the conceded amblyopic state of the eye had its genesis in hysteria ensuing from the accidental injury, and is therefore a compensable post-traumatic condition. The opinions summoned from the several ophthalmologists and neurologists on this point are in sharp disagreement; but it is our considered judgment that there is a clear preponderance in favor of the latter hypothesis.

Hysterical amblyopia is well known to the science of neurology; and in the search for the cause of this employee's conceded "industrial blindness" it is the more probable hypothesis by far. The inference of a radical deterioration of the eye after the accident is inescapable. One of the ophthalmologists retained by the employer said that such "involvement" may come "a few weeks, months or even years" after the trauma is sustained. Here, the onset of the degeneration came from two to four weeks after the accident, and within a short time there was permanent blindness, or what ophthalmologists recognize as industrial blindness. The accident occurred some two weeks after the employment began; and the plant physician, Dr. Rigeron, testified that a pre-employment physical examination of the employee made by him on July 9th, 1942, revealed a visual acuity "above 20-70ths" in "both eyes," correctible to 20-20, or normal vision. The employee was then but thirty-one years of age. Concededly, the significance of the correctibility of the visual deficiency to normal is the non-existence of amblyopia ex anopsia, for the discordant professional opinions are one on the proposition that this condition is not immediately correctible in any degree by a lens. An examination of the eye made upon the employee's admission to the hospital for treatment of the injury disclosed a visual acuity of 20-100, then uncorrectible. On the ensuing October 5th, some two weeks after his discharge from the hospital, it was found to be 20-200, correctible to 20-70. A week later it was 20-100, minus 1, correctible to 20-70. It alternated thereafter between 20-100, 20-120 and 20-200, until the eye reached its present permanent state of

20-200. There seems to be some difference of opinion among the professional witnesses, depending upon the chart or standard used, as to the import of these figures in terms of percentage ratio of sight to normal vision; but roughly 20-70 signifies a deficiency in visual power of from 28% to 36% of normal; 20-100, 44% to 51%; 20-120, about 56%; and 20-200, 90% to 100%.

But it is insisted that vision in the right eye could not possibly have been correctible to normal at the time of the pre-employment examination; and the later tests and two earlier diagnoses are cited as proof of error in this regard. There was a clinical examination of the employee's eyes at the Brooklyn Eye and Ear Hospital in April, 1936; and the examining staff surgeon testified that he diagnosed the condition of the right eye as amblyopia ex anopsia. Yet he said that the eye "had vision, but not perfect vision, not normal." The surgeon did not, himself, test the visual acuity of the eye. An offer in evidence of a hospital record purporting to show the result of such a test by an unidentified person was overruled. Of this, more hereafter. And an optometrist who examined the employee's eyes in June, 1939, made the same diagnosis; but it is clear that the conclusion was based solely upon his finding of a visual acuity of 20-200, or 10% of normal vision, correctible to 20-150, or 15%. He advised certain eye exercises which he was sure would improve vision; he had found them "usually" successful.

The late Dr. Dowd, long pre-eminent in the field of neurosis, was quite certain there had been such improvement. He perceived no inconsistency in the findings of the plant physician and the history. Impairment of vision due to amblyopia ex anopsia, he said, is "definitely" correctible by exercise and continued use, but not by a lens. He had no doubt whatever that the employee's blindness was the consequence of psychoneurosis, of the "conversion hysteria type," induced by the traumatic injury. The eye is "anatomically normal," he said; and the correctibility of the visual acuity to 20-70 signified astigmatism rather than amblyopia ex anopsia as the cause of the visual deficiency, for a lens is wholly ineffectual in the latter case. And quite apart from the loss

of vision, the witness ascertained that the neurosis had given rise to a permanent disability of 20% of total. Another neurologist, Dr. Hirschberg, was of the like opinion. He and Dr. Blumberg, a neurologist engaged by the employer, together examined the eye in February, 1943. The former found, as he had on several prior examinations, a visual acuity of 20-200, correctible to 20-100 by a compound cylinder lens, which latter finding he termed of "doubtful" accuracy and at best "a slight improvement." He said that "at times" the subject "saw the letters" on that chart level "and then they would fade away." In view of the absence of evidence of pathology, the failure of correction denoted in his opinion the existence of amblyopia; and he was certain that the loss of vision was the result of traumatic hysteria traceable to the injury, i. e., hysterical amblyopia. In a word, the witness declared that the employee is "blind in the eye from hysteria, a neurological condition; no other diagnosis can be made." And Dr. Blumberg also found the same visual acuity, but he said it was correctible to 20-70. There was no sympathetic ophthalmia. This witness was of the view that the diminution in the acuteness of the vision "is due entirely to an error of refraction," and not to the accident. Although there was a plentitude of objective as well as subjective evidence of neurosis, some of it coming from the employer's own medical witnesses, he determined that the employee "is not a hysteric, and the factual situation is such that it does not bear out a diagnosis of amblyopia from hysteria." He considered "the chances of improving" the visual acuity of an eye affected with amblyopia ex anopsia as "practically nil," the while conceding that "some of them do improve." The clear weight of the evidence is to the contrary. Evidence was elicited from the employer's own specialists that long experience had shown the visual power of an eye so conditioned can be improved by exercise and use. The employer's opinion evidence thus was far outweighed by the positive and convincing proof of like character adduced by the employee, considered in relation to the history and all the facts and circumstances.

And the evidence, even that introduced by the employer, demonstrates the existence of a substantial measure of visual

power before the accident, and for a brief period thereafter; and the subsequent decline of visual acuteness is reasonably suggestive of traumatic amblyopia, *i. e.,* hysterical amblyopia, of which the outstanding symptom, according to generally accepted scientific opinion, is a diminution in vision which frequently eventuates in complete blindness. The end result here is the blindness of one who had effective vision in both eyes before the accident. And there is no evidence that in the natural course the pre-existing abnormality is itself rapidly progressive, or even that it is progressive at all. The inference of traumatic etiology is compelling.

It is also assigned for error that the Deputy Commissioner overruled the offer in evidence of a record of the Brooklyn Eye and Ear Hospital, heretofore adverted to, purporting to exhibit the result of a clinical visual acuity test of the employee in 1936.

It was sought to establish the record by the testimony of the staff surgeon who made the eye examination, but not the acuity test. That, he said, was done by a nurse whom he was unable to identify, but not under his supervision nor in his presence. The record of the alleged test was not in his handwriting; nor was the handwriting identified. He said the staff nurses labored under the control of a "superintendent," but this functionary was not named or called as a witness.

It would seem that in these circumstances there was not such circumstantial guarantee of trustworthiness (to use the formula of Professor Wigmore) as fairly to serve as a substitute for cross-examination, and so the record in this particular was not authenticated. But we need not determine the question. The ruling was not prejudicial to the employer. As we have seen, the witness testified that he diagnosed the condition of the right eye as amblyopia ex anopsia, but that the eye "had vision," although not "perfect" or "normal" vision.

The judgment is affirmed, with costs.